IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLENE M. TEELING,<br><br>               Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social<br>Security,<br><br>               Defendant. | Case No. 13 C 6951<br><br>Judge Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charlene M. Teeling ("Teeling") seeks review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability insurance benefits. Teeling asks the Court to reverse or remand the Commissioner's decision on the ground that the Administrative Law Judge (the "ALJ") who heard her claim erred by declining to accept as credible her subjective complaints regarding the extent of her alleged physical limitations. The Commissioner, on the other hand, seeks an order affirming the decision. For the reasons stated herein, Teeling's Motion is denied and the Commissioner's Motion is granted.

## I. BACKGROUND

On November 9, 2010, Teeling filed an application for disability insurance benefits, alleging that she had become disabled on October 19, 2006. Her application was denied initially, which decision was affirmed upon reconsideration. Thereafter, Teeling sought a hearing before an ALJ.

### A. The ALJ Hearing

On April 3, 2012, a hearing was convened at which Teeling appeared with the assistance of counsel. At the time of the hearing, Teeling was fifty-five years old, 5'5", and weighed 218 pounds. Teeling testified that she had a ninth grade education and that she had not worked since 2008. From 1999 until 2006, Teeling was employed full-time as a manager at a Kmart store, where her duties included supervising checkout operators and working at the service desk. The job required her to be on her feet all day and occasionally involved lifting items weighing up to sixty pounds.

In 2006, Teeling was laid off from her job at Kmart. After that, she stated that her only other history of employment was a stint in 2008 as a part-time school cafeteria aide with the Valley View School District. Teeling was forced to leave that job after only a month, however, because she felt that she could no longer stand on her feet for long periods of time and she

believed that the job was contributing to her high blood pressure.

Teeling testified that she had been plagued with numerous health issues over the preceding sixteen years, including back, knee, foot, shoulder, and leg pain, as well as heart disease and other serious conditions.  She stated that she had scoliosis in her upper back, a ruptured disc in her neck, which was the result of a car accident that occurred twenty-seven years prior to the hearing, and a herniated disc in her lower back, which she had injured by bending over the wrong way.  Teeling described her neck and back pain as being "constant," and stated that her pain was between "eight" to "nine" on a scale of zero to ten. Although her doctors recommended surgery, Teeling indicated that she had elected not to undergo any procedure because she was afraid that a positive result would be uncertain.  She stated that she took various medications to alleviate her pain and occasionally used a traction unit, Styrofoam roller, and other home therapies.

In addition to her neck and back problems, Teeling testified that she had experienced constant leg and knee pain for the past fifteen years.  Although she had undergone several knee surgeries, she reported that her legs tired easily and that her knees often would give out due to lack of adequate circulation. She described her leg pain as being a "seven" on the pain-scale,

but that occasionally it got so bad that it felt like a "ten." At times, Teeling would be in so much pain that she could not walk.

Teeling also stated that she experienced foot pain, which she explained was the result of her car accident, during which her ankle was "totally crushed" and her right foot was "broken in half." As a consequence, she no longer could bend her right foot properly. At times, it would "lock up" entirely causing her to lose her balance and fall. Teeling stated that she had undergone an MRI, but that her doctor had not recommended any particular course of treatment. She described her foot pain as being constant, with a pain-scale rating of "six."

Teeling further reported that she had developed shoulder problems in 2009 or 2010. She stated that she had undergone surgery twice on her right shoulder and once on her left. Despite those surgeries, however, Teeling testified that she continued to have limited movement and strength in her arms. Teeling also noted that she suffered from neck discomfort and headaches, which she indicated were connected to her arm and shoulder problems. Teeling described her pain as being a "five" or "six" on the pain-scale. Nonetheless, she stated that she achieved partial relief through a combination of Vicodin and various therapeutic exercises.

Teeling also testified that she suffered from serious heart problems. At around the time she left her job at Kmart, she had two stents placed in one of the arteries to her heart in an effort to alleviate a 90 percent blockage. She stated that she also had at least four other less severe blockages.

In addition to her heart condition, Teeling complained of a variety of other medical issues, including sinus problems, Gastro Esophageal Reflux Disease ("GERD"), and bile leakage, all of which apparently were controlled by medication. Teeling further indicated that she suffered from bronchial asthma, which was aggravated by pollen, weather changes, fumes, and certain chemical cleaning solutions. She also noted that she smoked half a pack of cigarettes per day, but that she was in the process of quitting. She stated that she experienced shortness of breath and that she would need to use an inhaler after walking even short distances. Teeling further testified that she had been diagnosed with sleep apnea, but stated that she did not use a Continuous Positive Airway Pressure ("CPAP") machine because she was claustrophobic.

At the time of the hearing, Teeling was taking numerous medications, including Toprol (a beta-blocker), Lisinopril (an ACE inhibitor), Norvasc (a blood pressure medication), Nitroglycerine (an angina medication), Isosorbide (another angina medication), Aspirin, Zocor (a cholesterol medication), Xanax (an

anxiety medication), Carafate (an anti-ulcer medication), an albuterol sulfate inhaler (for asthma), Flonase (a nasal spray for allergy relief), Vicodin (a pain medication), Cholestyramine (a bile acid sequestrant), and Prilosec (a drug used to treat symptoms of GERD).

With regard to her alleged functional limitations, Teeling testified that she had a reduced range of arm motion and that she could not lift her arms higher than her head or grab items anywhere other than at chest level. She stated that she was capable of lifting items that weighed as much as a gallon of milk, but noted that she was unable to carry around an object of that weight for any extended period of time. Teeling further stated that, while she could carry around lighter objects, such as a paper file, she otherwise had no control over the strength in her arms. To that end, Teeling indicated that she relied on her husband to assist with grocery shopping and to lift or move heavier items around the house.

Teeling testified that she also experienced some difficulty performing basic household chores. Although she was able to do laundry, she would need her husband's help carrying clothes to the washer. Similarly, while she was capable of preparing meals, she would ask her son or his girlfriend to load the food into the oven. She stated that she also relied on her son to vacuum and take out the trash.

Teeling further testified that walking for more than half an hour would aggravate her back, leg, knee, and foot pain. Likewise, she stated that she was unable to sit in one position for longer than half an hour, after which she would need to get up and move to a different position. Teeling noted that her ailments also had affected her sleeping and her ability to drive. She stated that, although she was capable of operating a car, she felt it necessary to limit herself to shorter drives.

Teeling further complained of difficulty squatting and picking up items off the floor. She stated that she would become so fatigued at various points throughout the day that she would need to rest in a recliner in order to recover. On a typical day, she spent most of her time sitting in her recliner, getting up only occasionally to walk around.

A vocational expert ("VE") also testified at the hearing. The VE described Teeling's past position at Kmart as being skilled to semi-skilled work at a light exertional level. The VE noted, however, that Teeling had claimed to perform tasks that would indicate that she had been working at a medium exertional level. With regard to Teeling's brief time as a school cafeteria aide, the VE classified this position as being unskilled work at a light exertional level.

The ALJ then posed a number of hypothetical questions to the VE. First, the ALJ asked the VE to consider the vocational

capacity of an individual who could lift or carry twenty pounds occasionally, lift or carry ten pounds frequently, stand or walk for six hours out of an eight-hour workday, sit six hours out of an eight-hour workday, push and pull without limitation, reach overhead only occasionally, never climb ladders, ropes, or scaffolds, and have only limited exposure to extreme cold, hazards, fumes, odors, dusts, gases, and other pulmonary irritants. The VE testified that a person with those limitations would be capable of performing Teeling's past work as a Kmart manager/cashier-checker as such a position would be performed generally in the national economy.

Next, the ALJ asked the VE to opine as to the vocational capabilities of a person who could lift up to ten pounds, lift or carry on an occasional basis items such as docket files, ledgers, and small tools, stand or walk for two hours out of an eight-hour day, sit six hours out of an eight-hour day, push and pull frequently, reach overhead only occasionally, never climb ladders, ropes, or scaffolds, and have limited exposure to cold, hazards, fumes, odors, dusts, gasses, and other pulmonary irritants. The VE answered that such a person would not be able to perform Teeling's past work as such work is performed generally in the national economy.

The ALJ next asked the VE whether, assuming the same hypothetical functional capacity as her previous example, a

person of Teeling's age, education, and work experience could perform any other occupation that existed in significant numbers in the national economy. To this question, the VE testified that such an individual could work as an information clerk (DOT No. 237367056), an order clerk (DOT No. 209567014), or an interview clerk (DOT No. 205367014).

Finally, the ALJ asked the VE whether any occupations existed for an individual with the same characteristics as the previous example, but who also was limited by having to recline frequently throughout the day. The VE answered that no such jobs existed.

### B. The ALJ's Decision

In a written decision dated June 19, 2012, the ALJ denied Teeling's claim on the ground that she was not disabled within the meaning of the Social Security Act. Applying the five-step sequential analysis as required by 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found at Step One that Teeling had not engaged in substantial gainful activity since the alleged disability onset date. At Step Two, the ALJ determined that Teeling suffered from the following severe impairments: degenerative joint disease of the right knee, history of left rotator cuff tear, degenerative joint disease of the right shoulder, coronary artery disease, degenerative disc disease, asthma, hypertension, and obesity. At Step Three, the ALJ concluded that none of

Teeling's impairments, alone or in combination, met or medically equaled any criteria considered to be automatically disabling under the Social Security Administration's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). At Step Four, the ALJ determined that Teeling had the residual functional capacity to perform a range of light work. Specifically, the ALJ found that Teeling

> could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours out of an eight-hour workday, sit for six hours out of an eight-hour workday, and push and pull on a frequent basis, but was limited to occasional overhead reaching with the upper extremities bilaterally.

The ALJ further found that Teeling should never climb ladders, ropes, or scaffolds, and that her exposure to extreme cold, hazards, fumes, odors, dusts, gasses, poor ventilation, and other pulmonary irritants should be limited. In arriving at that determination, the ALJ explained that she did not find credible Teeling's statements regarding the intensity, persistence, and limiting effects of her symptoms because her testimony in that regard was inconsistent with the medical reports and other objective evidence in the case. Based upon the VE's testimony, the ALJ determined that Teeling had the residual functional capacity to perform her past relevant work as a manager/cashier-checker at Kmart. Accordingly, the ALJ concluded that Teeling

was not disabled under the Social Security Act and ended her analysis at Step Four.

### C. Appeals Council

On August 22, 2012, Teeling filed a request seeking review of the ALJ's decision. The Appeals Council denied that application on July 26, 2013, and this action ensued.

## II. STANDARD OF REVIEW

To establish a disability under the Social Security Act, a claimant must demonstrate that she has a medically determinable physical or mental impairment that renders her unable to engage in substantial gainful work. 42 U.S.C. § 423(d). In determining whether a claimant is disabled, the ALJ is required to apply the five-step sequential evaluation process under which the following must be considered: (1) whether the claimant is employed currently; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that meets or medically equals the severity criteria set forth in the Listings; (4) if the claimant's impairment does not meet that criteria, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520; *Simila v. Astrue,* 573 F.3d 503, 512-13 (7th Cir. 2009).

The claimant bears the burden of proof with respect to the first four steps of this analysis. *Briscoe v. Barnhart,* 425 F.3d

345, 352 (7th Cir. 2005). If the ALJ determines at any one of these initial four steps that the claimant is disabled or not disabled, she is not required to proceed further. 20 C.F.R. § 404.1520(a)(4). If, however, the claimant sustains her burden of proof for the first four steps, the burden shifts at Step Five to the Commissioner, "who must then present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Perry v. Colvin,* 945 F.Supp.2d 949, 963 (N.D. Ill. 2013).

Where, as here, the Appeals Council denies review, the ALJ's determination stands as the Commissioner's final decision, which may be challenged in federal court pursuant to 42 U.S.C. § 405(g). 20 C.F.R. §§ 416.1455, 416.1481. The district court's review is limited to assessing whether the ALJ applied the correct legal standards and whether her decision is supported by "substantial evidence." *See,* 42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ concerning whether [the claimant] is disabled," the ALJ's determination will be upheld as long as her decision has "adequate support" in the record. *Simila,* 573 F.3d at 513 (quotation marks and citation omitted).

Although this standard of review is deferential, the Court cannot simply "rubber stamp" the Commissioner's determination. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.2002). Rather, the Court at least must be able to discern a "logical bridge" between the evidence and the ALJ's ultimate conclusion. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). The ALJ need not address "every piece of evidence or testimony in the record," however, *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001), so long as she "minimally articulate[s] [her] reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).

### III. ANALYSIS

Teeling's sole argument on appeal is that the ALJ failed to provide an adequate explanation for why she discredited portions of Teeling's testimony regarding the extent of her alleged limitations. Teeling complains that the ALJ's stated findings in that regard are undeveloped and offer no insight into the credibility analysis factors set forth in Social Security Ruling 96-7p ("SSR 96-7p").

On review, the ALJ's credibility determination is to be accorded "special deference" and will not be overturned unless it is "patently wrong." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). In assessing a claimant's credibility, the ALJ must consider "the entire case record, including the objective medical

evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The ALJ also must take into account several other factors, "including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (citing 20 C.F.R. § 404.1529(c) and SSR 96-7p). Although the ALJ must support her credibility finding with "specific reasons," *id.*, her opinion need not include a "complete written evaluation of every piece of evidence." *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013) (citation omitted).

Teeling's primary objection to the ALJ's credibility determination arises from the ALJ's use of the oft-criticized phrase that Teeling's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent they [were] inconsistent with" the ALJ's residual functional capacity assessment. While the Seventh Circuit has voiced with some frequency its disapproval of this conclusory language, *see, e.g., Pierce v. Colvin,* 793 F.3d 1046, 1050 (7th Cir. 2014), the use of such boilerplate "does not

automatically undermine or discredit the ALJ's ultimate conclusion if [s]he otherwise points to information that justifies [her] credibility determination." *Pepper,* 712 F.3d at 367-68; *see also, Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir. 2013).

Here, despite the inclusion of some boilerplate language, the ALJ's opinion cited a variety of specific evidence in support of her credibility finding. First, the ALJ noted that Teeling's testimony regarding her chest pain was rebutted to a significant extent by the evaluations of her treating physicians, whose records indicated that Teeling's complaints of chest pain were only "intermittent and varied." For example, Teeling reported that she experienced chest pain at appointments in February and May of 2008, but denied having any such pain at all in August 2007, September 2008, and January 2010. Second, while Teeling claimed to have experienced a marked increase in back pain in 2011, the ALJ noted that a physical examination at that time revealed no pain with palpation of the thoracic or cervical spine, intact deep tendon reflexes, and negative straight leg raising. Third, the ALJ found Teeling's testimony regarding the severity of her shoulder and arm limitations to be inconsistent with medical reports that indicated that she had been "doing well" with her right shoulder following surgery. The ALJ further noted that, although Teeling continued to experience left

- 15 -

shoulder pain with abduction, she had reported experiencing less pain with other ranges of motion. Fourth, with regard to Teeling's knee pain, which she had alleged was "constant," the ALJ found it significant that radiographic imaging revealed nothing more than minimal degenerative changes and no evidence of fracture or dislocation. The ALJ also noted that Teeling had never even complained of right knee pain until April 2011, which was after the date she was last eligible to receive benefits – and, even then, a physical examination suggested that Teeling had retained a good range of motion and that her knee was neurovascularly intact. Fifth, the ALJ expressed doubt as to the extent of Teeling's claimed respiratory limitations in light of the fact that, despite her condition, "she was able to smoke a pack of cigarettes [*sic*] a day throughout the period at issue."

In addition to the material inconsistencies between Teeling's statements and the medical evidence, the ALJ offered several other reasons for why she found Teeling's testimony lacking in credibility. For instance, the ALJ noted that, although Teeling claimed at the hearing not to have worked anywhere besides Kmart or the Valley View School District, the record contained statements by Teeling to treating physicians that revealed that she also had been working in her home for a cable company throughout the period at issue. While Teeling contends that her comments in that regard should be ignored

because they appear only in "boilerplate language in a section of [her] cardiologist['s] notes that w[ere] apparently not updated over time," (Mem. in Supp. of Pl.'s Mot. to Reverse or Remand ("Teeling Mem.") at 10, ECF No. 12), the Court fails to see how that is a basis for disregarding this evidence. Social Security law does not prohibit physicians from using boilerplate in their treatment notes and, in any event, Teeling does not deny having made the comments. Her statements are a part of the record and the ALJ was entitled to consider them in assessing her overall credibility.

The ALJ also found Teeling's statements that she spent "nearly all day in a reclining chair" to be at odds with other evidence that suggested she was capable of a more active lifestyle. In particular, the ALJ noted that Teeling had engaged in activities such as "taking care of her grandchildren when they are sick." Although Teeling argues that this evidence "doesn't tell us much" because there is nothing to indicate whether caring for her grandchildren was anything more than a one-time occurrence, (Teeling Mem. at 10), it nevertheless counts against Teeling when considered in the context of the record as a whole.

In sum, the ALJ offered ample reasons for why she found Teeling's testimony to be inconsistent with other objective record evidence and her opinion provided a clear explanation of the factors that contributed to her credibility assessment. Her

determination in that regard was supported by substantial evidence.

### IV. CONCLUSION

For the reasons stated herein, the Commissioner's Motion for Summary Judgment [ECF No. 19] is granted and Teeling's Motion [ECF Nos. 11 & 12] is denied.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　　United States District Court

Dated:12/15/2014